IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| PHEASANTBROOK HOME OWNERS ASSOCIATION,<br><br>Plaintiff,<br><br>v.<br><br>THE TRAVELERS INDEMNITY COMPANY,<br><br>Defendant. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART TRAVELERS' MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 1:14-cv-00056-DN<br><br>District Judge David Nuffer |

Pheasantbrook Home Owners Association's ("PHOA" or "Pheasantbrook") filed a complaint for breach of a contract of insurance and breach of the covenant of good faith and fair dealing by The Travelers Indemnity Company ("Travelers") related to PHOA's insurance claim involving wind damage to PHOA premises. Travelers moves for summary judgment ("Motion").[1] Travelers believes it properly denied PHOA's supplemental demand for $540,897.70 because Travelers had previously agreed to pay PHOA $1,357,535.92, which, according to Travelers, constitutes the entire amount of damage caused by the windstorm. Travelers argues PHOA's demand for $540,897.70 is inappropriate because PHOA did not consult with Travelers prior to authorizing the contractor to complete the work. Travelers argues the additional work was performed to correct construction defects, wear and tear, and deterioration—all of which are excluded under the applicable policy. PHOA disagrees and

---

[1] Motion for Summary Judgment ("Motion"), docket no. 30, filed October 13, 2015.

opposes the Motion.[2] For the reasons stated below, the Motion is GRANTED IN PART AND

DENIED IN PART.

## TABLE OF CONTENTS

SUMMARY JUDGMENT STANDARD ................................................................................ 2
UNDISPUTED FACTS ...................................................................................................... 3
    Windstorm Causes Damage to PHOA Buildings ............................................................ 3
    PHOA Is Insured by Travelers ....................................................................................... 4
    Travelers and PHOA Conduct Initial Inspections .......................................................... 8
    PHOA Hires HWC, HWC Provides Estimates to Travelers............................................. 8
    February 27, 2012 Email from PHOA to Travelers......................................................... 9
    March 1, 2012 PHOA Board Meeting and Statements Regarding Building Code........... 10
    HWC Submits Work Orders ......................................................................................... 12
    May 14, 2012 Email and Payment from Travelers to PHOA ......................................... 12
    PHOA/HWC Advises of Project Completion and Submits Supplement.......................... 15
    Travelers Seeks More Information Regarding the Supplement....................................... 16
    Travelers Reviews Supplement and WA Report ........................................................... 17
    Travelers Denies Supplement ...................................................................................... 19
DISPUTED FACTS.......................................................................................................... 20
DISCUSSION .................................................................................................................. 22
    A.    Travelers Is Not Entitled to Summary Judgment as to Breach of Contract
          Claims .............................................................................................................. 22
          i.    There Is a Genuine Issue Regarding Whether PHOA Failed to Perform . 23
          ii.    There Is a Genuine Issue Whether Travelers Fulfilled All Its Obligations
              under the Policy ................................................................................ 25
    B.    Travelers Is Entitled to Summary Judgment as to Breach of Covenant of
          Good Faith and Fair Dealing Claims .................................................................. 27
ORDER ........................................................................................................................... 31

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law."[3] A factual dispute is genuine when "there is

sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[4] In

---

[2] Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment ("Opposition"), docket no. 37,
filed November 20, 2015.

[3] Fed. R. Civ. P. 56(a).

[4] *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).

determining whether there is a genuine dispute as to material fact, the court should "view the factual record and draw all reasonable inferences therefrom most favorably to the nonmovant."[5]

The moving party "bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law."[6] If the moving party carries this burden, then the burden shifts to the non-moving party to set forth specific, admissible facts from which a rational trier of fact could find for the non-moving party.[7]

## UNDISPUTED FACTS[8]

### Windstorm Causes Damage to PHOA Buildings

1. On December 1, 2011, PHOA suffered property damage as a result of a windstorm with winds in excess of 100 miles per hour ("Claim"). PHOA reported damage to the aluminum siding, gutters, fascia, soffit, fixtures, and roofs, as well as fence and tree damage.[9]

2. Each of the buildings sustained wind damage.[10]

---

[5] *Id.*

[6] *Id.* at 670-71.

[7] *Id.* at 671.

[8] The stated facts included in this section have been altered to include only undisputed portions. Therefore, when a footnote states that a fact is "undisputed," it means that *the portion included in this Undisputed Facts section* is undisputed, not that the party has admitted the version of the facts written by opposing counsel. Facts are deemed admitted if there is no specific denial or dispute stated in a response to that fact. DUCivR 56-1(c) (requiring party to "specifically controvert" stated facts if in dispute).

PHOA and Travelers each attempt to set forth *additional* facts in their responses to opposing counsel's stated facts. *See, e.g.*, Opposition at 8, ¶ 8 ("*Stating further*, Travelers did not include the aforementioned language in its May 14, 2012 email, or its August 5, 2013 denial."), Reply at 37, ¶ 76 ("Admit that as of February 27, 2012, there was a disagreement regarding the scope of repairs. *That disagreement was later resolved however*." (emphasis added)). The appropriate method to state facts is to include them in the "facts" section of the Motion or the "additional material facts" section of the Opposition. DUCivR 56-1. Therefore, additional facts included in the Opposition or Reply *in response to* the opposing party's stated facts are not considered as "facts" unless they are included in the Opposition section entitled "Additional Statement of Material Facts," Opposition at 23-27, or in the original statement of facts in the Motion. Motion at 8-23. *See* DUCivR 56-1(d) (instructing to disregard additional evidence stated in reply unless it is provided to show that an already-stated fact is undisputed).

[9] Motion at 12, ¶ 9. Undisputed by PHOA. Opposition at 8, ¶ 9.

[10] Opposition at 24, ¶ 71. Undisputed by Travelers. Reply Memorandum in Support of Motion for Summary Judgment ("Reply") at 36, ¶ 71, docket no. 41, filed December 11, 2015.

3. A windstorm is a covered cause of loss under the Policy, and Travelers accepted coverage for the Claim, subject to the Policy's terms, conditions, limitations, and exclusions.[11]

4. The December 1, 2011 loss was categorized as a CAT claim, which means it was a catastrophe with widespread damage exceeding $7 million.[12]

**PHOA Is Insured by Travelers**

5. PHOA is the named insured under Condominium PAC Policy No. I-680-3048W969 ("Policy") issued by Travelers with effective dates of December 4, 2010 to December 4, 2011.[13]

6. The Policy insures property at PHOA against covered losses:

A. COVERAGE

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from a Covered Cause of Loss.[14]

7. The Policy explains that "Covered Causes of Loss" include

RISKS OF DIRECT PHYSICAL LOSS unless the loss is:

**a.** Limited in Paragraph A.5, Limitations; or

**b.** Excluded in Paragraph B., Exclusions.[15]

8. The Policy excludes from coverage damage caused by wear and tear and hidden or latent defects in the insured premises:

---

[11] Motion at 12, ¶ 10. Undisputed by PHOA. Opposition at 8, ¶ 10.

[12] Opposition at 24, ¶ 69. Undisputed by Travelers. Reply at 36, ¶ 69.

[13] Motion at 8, ¶ 1; Certified Copy of Policy ("Policy"), Exhibit 2 to Motion, docket no. 30-3, filed October 13, 2015. Undisputed by PHOA. Opposition at 5, ¶ 1.

[14] Motion at 8, ¶ 2; Policy at ¶ A. Undisputed by PHOA. Opposition at 5, ¶ 2.

[15] Motion at 9, ¶ 3; Policy at ¶ A(4). Undisputed by PHOA "subject to all the terms and conditions of the Policy." Opposition at 5, ¶ 3. PHOA does not dispute that the Policy contains this language, but denies that the *specific loss or damage at issue* is "limited or excluded." Opposition at 5, ¶ 3. This is irrelevant, however, because the stated fact does not mention the specific loss or damage at issue. It is undisputed that the Policy contains this language.

**2.** We will not pay for loss or damage caused by or resulting from any of the following:

. . .

**d. (1)** Wear and tear;

**(2)** rust, corrosion, fungus, decay, deterioration, wet or dry rot, mold, hidden or latent defect or any quality in property that causes it to damage or destroy itself;[16]

9.    The Policy excludes from coverage continuous leaks, condensation, or vapor:

**2.** We will not pay for loss or damage caused by or resulting from any of the following:

. . .

**f.** Continuous or repeated seepage or leakage of water, or the presence or condensation of humidity, moisture or vapor, that occurs over a period of 14 days or more.[17]

10.    The Policy excludes from coverage faulty or defective design, workmanship,

repair, construction, materials, and maintenance:

**3.** We will not pay for loss or damage caused by or resulting from any of the following under Paragraphs a. through c. . . . .

**c.** Faulty, inadequate or defective:

**(1)** Planning, zoning, development, surveying, siting;

**(2)** Design specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

---

[16] Motion at 9, ¶ 4; Policy at ¶ B(2)(d)(1)-(2). Undisputed by PHOA "subject to all the terms and conditions of the Policy." Opposition at 5, ¶ 4. PHOA does not dispute that the Policy contains this language, but denies that the *specific loss or damage at issue* is "caused by the exclusion." Opposition at 5, ¶ 4. This is irrelevant, however, because the stated fact does not mention the specific loss or damage at issue. It is undisputed that the Policy contains this language.

[17] Motion at 9, ¶ 5; Policy at ¶ B(2)(f). Undisputed by PHOA "subject to all the terms and conditions of the Policy." Opposition at 6, ¶ 5. PHOA does not dispute that the Policy contains this language, but denies that the *specific loss or damage at issue* is "caused by the exclusion." Opposition at 6, ¶ 5. This is irrelevant, however, because the stated fact does not mention the specific loss or damage at issue. It is undisputed that the Policy contains this language.

(**3**) Materials used in repair, construction, renovation or remodeling; or

(**4**) Maintenance;
of part or all of any property on or off the described premises.[18]

11.     The Policy also has provisions applicable to repairs required by ordinance or law, including a $25,000 limit for such repairs:

k. **Ordinance or Law**

(1) In the event of damage by a Covered Cause of Loss to a building that is Covered Property, we will pay for:

. . .

(c) The increased cost of construction, meaning the increased cost to repair, rebuild or construct the BUSINESSOWNERS property as a consequence of enforcement of the minimum requirements of any ordinance or law. This increased cost of construction coverage applies only if:

(i) The building is insured for replacement cost;

(ii) The building is repaired, rebuilt or reconstructed; and

(iii) The repaired, rebuilt or reconstructed building is intended for similar occupancy as the current building, unless otherwise required by zoning or land use ordinance or law.

. . .

(6) The most we will pay for loss under this Additional Coverage for the total of all coverages described in

---

[18] Motion at 9-10, ¶ 6; Policy at B(3). Undisputed by PHOA "subject to all the terms and conditions of the Policy." Opposition at 6, ¶ 6. PHOA does not dispute that the Policy contains this language, but denies that the *specific loss or damage at issue* is "caused by the exclusion." Opposition at 6, ¶ 6. This is irrelevant, however, because the stated fact does not mention the specific loss or damage at issue. It is undisputed that the Policy contains this language.

Paragraph (1) above in any one occurrence is $25,000 at each described premises.[19]

12.   The Policy also requires that PHOA cooperate with Travelers in the event of a loss:

### E. PROPERTY LOSS CONDITIONS

The following conditions apply in addition to the Common Policy Conditions:

. . .

### 3. Duties in the Event of Loss or Damage

**a.** You must see that the following are done in the event of loss or damage to Covered Property:

. . .

**(6)** As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

. . .

**(9)** Cooperate with us in the investigation and settlement of the claim.[20]

13.   The Policy was a "replacement cost policy."[21]

14.   The Policy as issued had a blanket coverage limit in the amount of $18,215,653.00.[22]

---

[19] Motion at 10-11, ¶ 7; Policy at ¶¶ A(6)(k)(1)(c) and A(6)(k)(6). Undisputed by PHOA "subject to all the terms and conditions of the Policy." Opposition at 7, ¶ 7.

[20] Motion at 11, ¶ 8; Policy at ¶ E(3)(a)(6) and (9). Undisputed by PHOA "subject to all the terms and conditions of the Policy." Opposition at 8, ¶ 8.

[21] Opposition at 23, ¶ 66. Undisputed by Travelers "[s]ubject to the exclusions identified in Travelers' Motion[.]" Reply at 35, ¶ 66.

15.     The Policy does not prohibit or exclude the submission of a supplemental claim.[23]

**Travelers and PHOA Conduct Initial Inspections**

16.     Travelers' adjuster, Mike Slosek, conducted an initial inspection on December 4, 2011.[24]

17.     On December 6, 2011, the claim was reassigned to general adjuster Robert Lewis who retained Larry Tiernan of Young & Associates, a construction consultant, to assist with the scope of repairs and estimate of damage.[25]

18.     Beginning on December 12, 2011, Mr. Lewis and Mr. Tiernan met with PHOA's representative, Robin Wheelwright, and PHOA's contractor at the time, Pride Restorations, LLC ("Pride"), to inspect the premises and discuss the loss.[26]

19.     From December 12, 2011 through December 20, 2011, Mr. Tiernan and his associate, Rick Stevenson, inspected the PHOA premises.[27]

20.     On January 6, 2012, Mr. Tiernan met with Beth Schumaker from PHOA to perform a follow-up inspection on some PHOA buildings.[28]

**PHOA Hires HWC, HWC Provides Estimates to Travelers**

21.     Later in January 2012, PHOA fired Pride and hired Hoffman Weber Company ("HWC") to act as its general contractor to effect the repairs.[29]

22.     HWC's initial estimate, dated January 23, 2012, was for $1,849,141.46.[30]

---

[22] Opposition at 24, ¶ 67. Undisputed by Travelers. Reply at 35, ¶ 67.

[23] Opposition at 24, ¶ 68. Undisputed by Travelers. Reply at 35, ¶ 68.

[24] Motion at 12, ¶ 11. Undisputed by PHOA. Opposition at 8, ¶ 11.

[25] Motion at 12, ¶ 12. Undisputed by PHOA. Opposition at 8, ¶ 12.

[26] Motion at 12, ¶ 13. Undisputed by PHOA. Opposition at 9, ¶ 13.

[27] Motion at 12-13, ¶ 14; Undisputed by PHOA. Opposition at 9, ¶ 14.

[28] Motion at 13, ¶ 15. Undisputed by PHOA. Opposition at 9, ¶ 15.

[29] Motion at 13, ¶ 16. Undisputed by PHOA. Opposition at 9, ¶ 16.

23.     The January 23, 2012 Estimate called for the complete replacement of all roofs at PHOA.[31]

24.     Prior to May 10, 2012, Travelers stated that it did not agree to replace the amount of roofing HWC said needed replacement.[32]

25.     Travelers further had concerns about the claim proceeding to appraisal in that it did not want to "end up replacing all of the siding on all the buildings to match" if the appraisal panel did not agree with Travelers' proposed method of salvage repair.[33]

26.     HWC's estimated increased to $2,411,858.77 on February 8, 2012, when PHOA and HWC discovered there was no available match for the existing aluminum siding and, again, called for the complete replacement of all roofs.[34]

27.     Many of the roofs at PHOA were comprised of organic shingles, which are discontinued and no longer made.[35]

28.     Under replacement cost coverage, if the shingles are damaged from a covered cause of loss (windstorm) and need to be replaced, they would be replaced with new shingles.[36]

**February 27, 2012 Email from PHOA to Travelers**

29.     As of February 27, 2012, there was a disagreement between PHOA/HWC and Travelers and its consultant Young and Associates regarding the scope of repairs.[37]

---

[30] Motion at 13, ¶ 17. Undisputed by PHOA. Opposition at 9, ¶ 17.

[31] Motion at 13, ¶ 18. Undisputed by PHOA. Opposition at 10, ¶ 18. *See also* Opposition at 24, ¶ 74. Undisputed by Travelers. Reply at 36, ¶ 74.

[32] Opposition at 25, ¶ 80. Undisputed by Travelers, Reply at 39, ¶ 80.

[33] Opposition at 25, ¶ 81. Undisputed by Travelers. Reply at 39, ¶ 81.

[34] Motion at 13, ¶ 19. Undisputed by PHOA. Opposition at 10, ¶ 19.

[35] Opposition at 24, ¶ 75. Undisputed by Travelers. Reply at 37, ¶ 75.

[36] Opposition at 24, ¶ 70. Undisputed by Travelers. Reply at 36, ¶ 70.

[37] Opposition at 24, ¶ 76. Undisputed by Travelers. Reply at 37, ¶ 76.

30.     On February 27, 2012, the president of the PHOA board, Robin Wheelwright, sent an email to Mr. Lewis.[38]

31.     The email stated:

Bob,

The reason that Hoffman Weber did not provide an estimate with the same scope of repairs as yours is because Pheasantbrook HOA and H-W did not agree with the findings. When it comes to roofing, there is far more damage on the roofs than what the initial inspection had shown. Many of the roofs we have at Pheasantbrook are a discontinued organic shingle, which is no longer available and cannot be "patched" in with asphalt. A few repairs have bene [sic] done to the roofs out of sheer necessity, this does not mean that we want our roofs pieced together after a major catastrophic event like we had December 1st.

The reason that there [sic] siding estimate is a great deal higher is that the existing aluminum siding is no longer available to be matched. The profile of the siding and the color are both discontinued. I strongly believe that patching and salvaging will decrease valuation, certainly not "pre-storm condition". [sic] Even if you replaced a few buildings it would be unacceptable, as we would have mismatched and pieced together siding throughout our complex. Again, unacceptable.

It is the firm belief of Pheasantbrook HOA that Hoffman Weber has done their diligence on this project and we completely support their position that this project needs "replacement" in lieu of "salvage, piece together and repair."[39]

32.     On or about February 29, 2012 through on or about March 2, 2012, Mr. Tiernan, another construction consultant, Dustin Smoot, of Pie Consulting, and Andy Oakes, of HWC, inspected twelve roofs at PHOA.[40]

**March 1, 2012 PHOA Board Meeting and Statements Regarding Building Code**

33.     On March 1, 2012, the PHOA Board Members met to discuss the "Traveler's Claim/Wind Storm 12/1/2011."[41] Minutes of the meeting include the following statement:

---

[38] Opposition at 24, ¶ 77. Undisputed by Travelers. Reply at 37, ¶ 77.

[39] Opposition at 24-25, ¶ 78. Undisputed by Travelers, Reply at 38, ¶ 78.

[40] Motion at 13, ¶ 20. PHOA does not dispute that the inspection proceeded, but denies that Mr. Tiernan inspected on March 2, 2012. Opposition at 10, ¶ 20.

[41] PHOA Board Meeting Minutes of March 1, 2012 at 1, Exhibit 8 to Motion, docket no. 30-9, filed October 13, 2015.

> Per Any Oakes, there is a State building code that will mandate full replacement
> of a roof if it is deemed that >25% of the roof needs replacement. Andy is trying
> to 'lock' the damage scope into more than 25%-50% on every roof for approval.
> He will use the legality of the code after the approval has been issued by Bob
> Lewis/Traveler's for maximum roof replacement coverage. Andy believes that
> Traveler's will be 'forced' into full roof replacement on all but 3 of the roofs.[42]

The "State building code" referred to in the above statement is the 2006 International Residential

Code ("IRC").[43]

34.     During a deposition, Mr. Oakes stated:

> We were trying to get the city [of Centerville] to put the 2006 building code that if
> 25% or more of a roof is being done at any time given, the entire roof needs to be
> brought up to current building code, which means they would need to add ice and
> water on these, which means that roofs would need to be replaced. We were
> trying to get the city to put that on letterhead for us and they did not want to get
> involved in the battle between Pheasantbrook and the insurance company.[44]

35.     It is now undisputed that the 2006 IRC does not apply to the work done by HWC

at PHOA. Rather, the 2009 International Building Code ("IBC") was adopted by Centerville City

on June 15, 2010.[45]

36.     Even if the 2009 IBC had not been adopted by Centerville, the 2006 IRC would

not have applied because the 2006 IRC only applied to detached one- and two-family dwellings,

and the buildings at PHOA are four-family dwellings.[46]

---

[42] PHOA Board Meeting Minutes of March 1, 2012 at 1, Exhibit 8 to Motion, docket no. 30-9, filed October 13, 2015 (parenthesis omitted). PHOA does not dispute that the minutes contain the foregoing statement, but argues that the minutes were "unapproved." Opposition at 10, ¶ 21. PHOA is incorrect. The Minutes of the March 1 Board Meeting were approved by the Board on March 14, 2014. *See* Regular Board Meeting Minutes, Exhibit 2 to Reply, docket no. 41-2, filed December 11, 2014.

[43] Motion at 14, ¶ 21. Undisputed by PHOA. Opposition at 10, ¶ 21.

[44] Motion at 14, ¶ 22; Oakes Depo. at 60:10-22, Exhibit 7 to Motion, docket no. 30-8, filed October 13, 2015. Undisputed by PHOA. Opposition at 11, ¶ 22.

[45] Motion at 14, ¶ 23. Undisputed by PHOA. Opposition at 11, ¶ 23.

[46] Motion at 14, ¶ 24. Undisputed by PHOA. Opposition at 11, ¶ 24.

37.     The 2009 IBC, unlike HWC's interpretation of the 2006 IRC, does not contain a 25% threshold that would require construction beyond the 25% threshold on any given building component to comply with current code.[47]

38.     On August 18, 2015, PHOA's expert, Mr. Hoffman, advised in his deposition that the 2006 IRC did not apply, but the 2009 IBC was applicable to the PHOA repairs.[48]

**HWC Submits Work Orders**

39.     PHOA was presented with several work orders by HWC on May 6, 2012, which were signed by some board members that day and ultimately formally approved by the PHOA board on June 5, 2012.[49]

40.     The first work order addressed the siding repairs, while the second called for the complete replacement of all the roofs at PHOA (except the maintenance shed), and repair and replacement of various bridges on the Premises (which were required because they were in general disrepair, not because they were damaged in the Windstorm). The total contracted amount for all of these repairs was $2,010,916.00, which is $653,380.08 more than $1,357,535.92.[50]

**May 14, 2012 Email and Payment from Travelers to PHOA**

41.     On May 14, 2012, Robert Lewis wrote an email to PHOA President Robin Wheelwright.[51] In that email, Mr. Lewis stated that "[w]e believe the necessary repairs, to restore

---

[47] Motion at 14, ¶ 25. Undisputed by PHOA. Opposition at 11, ¶ 25.

[48] Motion at 14, ¶ 26. Undisputed by PHOA. Opposition at 12, ¶ 26.

[49] Motion at 15, ¶ 29. Undisputed by PHOA. Opposition at 12, ¶ 29.

[50] Motion at 15-16, ¶ 30. Undisputed by PHOA. Opposition at 13, ¶ 30.

[51] Motion at 16, ¶ 32. Undisputed by PHOA. Opposition at 13, ¶ 32.

the property to its pre-loss condition as owed by the policy of insurance, can be completed for $1,357,535.92."[52]

42.    Mr. Lewis also explained that Travelers would issue payment to PHOA in the amount of $776,170.07, and the remaining amount would be issued once construction was completed.[53]

43.    On May 14, 2012, Travelers issued the actual cash value payment of $776,170.07 to PHOA.[54]

44.    On July 5, 2013, Travelers issued a payment to PHOA in the amount of $380,517.71.[55]

45.    PHOA did not agree to the $1,357,535.92 estimate.[56]

46.    PHOA decided to proceed with the roof repairs, despite being dissatisfied with what Travelers was offering to pay for.[57]

47.    Mr. Lewis's email also explained that:

It has been our experience that there is always the possibility of missed or hidden damage to be found once demolition is complete, and restoration is started. However, *any supplemental costs, or missed damages, must be submitted to Travelers Casualty Insurance Company of America (hereafter Travelers) for our review and approval prior to any additional costs being incurred.* We reserve the right to *decline consideration for any supplemental costs that we have not reviewed and approved prior to their obligation and/or submission.* When, or if, a supplement item or cost is identified, travelers requests that we be given

---

[52] Opposition at 13-14, ¶ 33. Undisputed by Travelers. Reply at 21, ¶ 33.

[53] Motion at 16, ¶ 34. Undisputed by PHOA. Opposition at 14, ¶ 34.

[54] Motion at 18, ¶ 37. Undisputed by PHOA. Opposition at 16, ¶ 37.

[55] Motion at 21, ¶ 52. Undisputed by PHOA. Opposition at 19, ¶ 52.

[56] Opposition at 26, ¶ 83. Undisputed by Travelers. Reply at 40, ¶ 83.

[57] Opposition at 25, ¶ 82. Undisputed by Travelers. Reply at 39, ¶ 82.

immediate notice of the supplement (within 3 business days), *so that we may visit the site, if necessary, and/or communicate with the contractor.*[58]

48.     Mr. Lewis's email also stated that:

1. It is Travelers' position that we agree to reimburse you for any repair/replacement costs that are necessary to affect repairs as owed according to the policy of insurance. Once you choose a contractor to affect the reconstruction, we will be happy to work with you and the contractor to verify that no necessary repair/reconstruction costs have been overlooked in relation to the scope of repair. This will ensure a fair and equitable claim settlement.

2. *Any supplemental costs, or missed damages, must be submitted to Travelers for our review prior to any costs being incurred.* We reserve the *right to decline consideration for any supplemental costs that we have not reviewed and approved* prior to their obligation and/or submission.

3. When, or if, a supplement item or cost is identified, *Travelers requests that we be given immediate notice of the supplement (within 3 business days), so that we may visit the site if necessary*, and/or communicate with the contractor. Travelers will agree to retain a cost consultant to monitor the repair costs, if necessary. This will be done at or [sic] cost and discretion.

4. If any additional/supplemental costs are required by the building department, and/or local laws or ordinances, Travelers does request that any additional code related costs be submitted to us for our review and approval prior to any agreements/contracts to incur the costs. We will require verifiable documentation and/or proof to verify that these "code" type supplements are required due to a specific building code, law, and/or ordinance.[59]

49.     The requirement contained with Mr. Lewis's May 14, 2012 email that

"supplemental costs or missed damages, must be submitted to Travelers . . . for . . . review and

approval prior to any additional costs being incurred" is not contained in the Policy.[60]

50.     Travelers stipulations for the submission of supplements are not contained within

the Policy.[61]

---

[58] Motion at 16-17, ¶ 35 (emphasis added by Travelers). Quoted portion undisputed by PHOA. Opposition at 15, ¶ 35.

[59] Motion at 17-18, ¶ 36. Undisputed by PHOA. Opposition at 16, ¶ 36.

[60] Opposition at 26, ¶ 84. Undisputed by Travelers, Reply at 40, ¶ 84.

[61] Opposition at 26, ¶ 85. Undisputed by Travelers. Reply at 41, ¶ 85.

51.     Mr. Lewis's May 14, 2012 email did not quote the "cooperation" clause of the Policy.[62]

52.     As of May 14, 2012, Travelers was of the opinion that PHOA had cooperated.[63]

**PHOA/HWC Advises of Project Completion and Submits Supplement**

53.     On October 2, 2012, Robin Wheelwright advised Travelers they were nearing completion of the project and asked Travelers to consider an inspection of the removal and replacement work.[64] Travelers did not perform such an inspection.[65]

54.     On October 3, 2012, Robin Wheelwright wrote an email to Mr. Lewis stating: "It appears that the Pheasantbrook Community is nearing the conclusion of many major construction projects. It is finally all coming together and for the most part, we are very pleased with the choices the HOA has made in rebuilding, replacing and repairing."[66]

55.     On May 7, 2013, Mr. Lewis received a call from HWC, advising that they would be submitting a supplemental estimate. Mr. Lewis did not discuss the supplemental estimate at that time.[67]

56.     A supplemental estimate includes additional damage outside of the initial scope, or include items that were missed within the original scope that should have been included.[68]

57.     On June 1, 2013, PHOA advised Travelers that construction, including the punch list items, had been completed.[69]

---

[62] Opposition at 26, ¶ 86. Undisputed by Travelers. Reply at 41, ¶ 86.

[63] Opposition at 26, ¶ 87. Undisputed by Travelers. Reply at 41, ¶ 87.

[64] Opposition at 26, ¶ 88. Undisputed by Travelers. Reply at 41, ¶ 88.

[65] Opposition at 26, ¶ 89. Undisputed by Travelers. Reply at 41, ¶ 89.

[66] Motion at 18, ¶ 39, n. 47. Undisputed by PHOA. Opposition at 16, ¶ 39.

[67] Opposition at 26, ¶ 92. Undisputed by Travelers. Reply at 42, ¶ 92.

[68] Opposition at 26, ¶ 91. Undisputed by Travelers. Reply at 42, ¶ 91.

[69] Motion at 18, ¶ 40. Undisputed by PHOA. Opposition at 17, ¶ 40.

58.     On June 6, 2013, HWC submitted the supplemental estimate in the amount of $540,897.70 ("Supplement") to Travelers stating it was seeking payment for "complete roof replacement, additional underlayment for low slope areas, decking for unnailable [sic] surfaces, and sill flashing around windows." With the Supplement, HWC provided a cost breakdown for the supplemental work and building permits pulled during the construction.[70]

59.     Travelers did not speak with HWC regarding the Supplement.[71]

60.     HWC's Supplement did not include costs to redo work, or the cost to correct poor workmanship.[72]

61.     The Supplement includes a full summary of the damages caused by the wind loss event and accurately reflects the work that was performed and was reasonable and necessary to repair and/or replace the property damage loss.[73]

62.     Travelers' consultant, Young & Associates, never performed an inspection at the property relative to the Supplement submitted.[74]

**Travelers Seeks More Information Regarding the Supplement**

63.     On June 14, 2013, Mr. Lewis sent PHOA a letter concerning the Supplement, raising concerns that PHOA was notifying Travelers of a significant deviation after the construction had been completed and reserving rights under the Policy. Mr. Lewis requested that PHOA provide:

> . . . all documentation in your/their [HWC's] possession that would support the line items in the supplemental damage claim. This may include photographs, invoices, sub-contract agreements, material invoices, project accounting

---

[70] Motion at 19, ¶ 41. Undisputed by PHOA. Opposition at 17, ¶ 41.

[71] Opposition at 27, ¶ 95. Undisputed by Travelers. Reply at 42, ¶ 95.

[72] Opposition at 26, ¶ 93. Undisputed by Travelers. Reply at 42, ¶ 93.

[73] Opposition at 27, ¶ 94. Undisputed by Travelers. Reply at 42, ¶ 94.

[74] Opposition at 27, ¶ 98, Undisputed by Travelers. Reply at 43, ¶ 98.

summaries/records, proofs of payment, and other items that support the additional amounts being claimed.[75]

64.     On June 24, 2013, in response to Travelers' request, HWC submitted a report from Western Architecture ("WA Report") to support the Supplement with the explanation that the WA Report "brought about the supplements. The work complete [sic] was done to compile [sic] with building standards."[76]

65.     Upon being advised that PHOA had retained an architectural firm, Travelers did not discuss the same with PHOA.[77]

66.     The WA Report was prepared after WA's retention by PHOA "to complete an assessment of the building envelope components on the structures located at Pheasantbrook . . . in conjunction with the recent roofing and siding replacement in the community" by HWC.[78]

67.     One of WA's three primary objectives was to "[a]ddress defective construction that is not in compliance with prevailing building code, manufacturers [sic] requirements and industry standard practices at the time of construction."[79]

68.     Travelers did not have any discussions with Western Architecture regarding the WA Report.[80]

**Travelers Reviews Supplement and WA Report**

69.     On June 24, 2013, Mr. Lewis requested that Travelers' construction consultant, Mr. Tiernan of Young and Associates review the Supplement and the WA Report to determine

---

[75] Motion at 19, ¶ 42. Undisputed by PHOA. Opposition at 17, ¶ 42.

[76] Motion at 19, ¶ 43. Undisputed by PHOA. Opposition at 17, ¶ 43.

[77] Opposition at 26, ¶ 90. Undisputed by Travelers. Reply at 42, ¶ 90.

[78] Motion at 20, ¶ 44. Undisputed by PHOA. Opposition at 18, ¶ 44.

[79] Motion at 20, ¶45. Undisputed by PHOA. Opposition at 18, ¶ 45.

[80] Opposition at 27, ¶ 96. Undisputed by Travelers. Reply at 43, ¶ 96.

"if the additional charges represent reasonable and necessary costs of repairs related to the windstorm."[81]

70.     On July 29, 2013, Mr. Tiernan sent his report ("YA Report") concerning the Supplement to Mr. Lewis.[82]

71.     Mr. Tiernan concluded that none of the Supplement's additional charges represented reasonable and necessary costs that were related to the Windstorm.[83]

72.     Mr. Tiernan observed that:

[t]here is no documentation or comments, etc. within the supplement which would support the addition of any of the included items in the approved scope of work for Pheasantbrook. Accordingly, YA has no basis on which to support or not support the respective work scope additions for a particular building.[84]

73.     Mr. Tiernan further observed that:

YA and HWC had previously agreed on the buildings and quantities associated with roofing repairs for the claim; there had been no information presented to YA that those previously approved quantities needed to be revised.[85]

74.     Mr. Tiernan explained that:

a. The sill flashing that PHOA requested payment for would not be required as a result of the windstorm;

b. YA had not observed in all of its inspections, and PHOA did not present any evidence of a significant amount of wall sheathing that required replacement; and

c. While there may have been a need for roof sheathing not called for in the original scope of work, PHOA did not present any evidence to demonstrate that these areas were indeed discovered during construction.[86]

---

[81] Motion at 21, ¶ 51. Undisputed by PHOA. Opposition at 19, ¶ 51.

[82] Motion at 21, ¶ 53. Undisputed by PHOA. Opposition at 19, ¶ 53.

[83] Motion at 21, ¶ 54. PHOA *disagrees* with Mr. Tiernan, but does not dispute that Mr. Tiernan came to this conclusion. Opposition at 20, ¶ 54. It is an undisputed fact that *Mr. Tiernan* concluded that the additional charges did not represent reasonable and necessary costs that were related to the Windstorm. Opposition at 20, ¶ 54.

[84] Motion at 21, ¶ 55. PHOA *disagrees* with Mr. Tiernan, but does not dispute that Mr. Tiernan made this statement. Opposition at 20, ¶ 55. Therefore, it is an undisputed fact that Mr. Tiernan made this statement.

[85] Motion at 21-22, ¶ 56. PHOA *disagrees* with Mr. Tiernan, but does not dispute that Mr. Tiernan made this statement. Opposition at 20, ¶ 56. Therefore, it is an undisputed fact that Mr. Tiernan made this statement.

75.     Mr. Tiernan explained that:

In any event, it is YA's opinion that the observed construction and maintenance deficiencies included in the Western report do not have any bearing on the wind event of December 2011, which was the basis for the carrier's (and YA's) involvement in the claim. Construction deficiencies associated with HWC's work need to be addressed directly with HWC, while any observed maintenance deficiencies need to be addressed by the Pheasantbrook HOA relative to the property's long term maintenance plan.[87]

**Travelers Denies Supplement**

76.     On August 5, 2013, Travelers denied PHOA's claim for payment of the Supplement.[88]

77.     Travelers explained it and its building consultants had reviewed the Supplement and the WA Report and that the Supplement was not covered because:

1) Travelers was given no notice of the alleged additional damages prior to their repair and had no opportunity to inspect/document or validate the nature of the damages, and 2) the additional costs appear to pertain to repairs that were associated with correcting construction defects as identified in the report from WA.[89]

78.     Travelers, nevertheless, requested that PHOA provide any "new, or previously undisclosed, information that [PHOA] may feel might impact Travelers' position . . . within the next thirty (30) days and we will review it promptly."[90]

79.     PHOA did not provide any additional information, and instead filed this lawsuit.[91]

80.     PHOA is seeking complete replacement of all the roofs due to wind damage.[92]

---

[86] Motion at 22, ¶ 57. Undisputed by PHOA. Opposition at 21, ¶ 57.

[87] Motion at 22, ¶ 58. PHOA *disagrees* with Mr. Tiernan, but does not dispute that Mr. Tiernan made this statement. Opposition at 21, ¶ 58. Therefore, it is an undisputed fact that Mr. Tiernan made this statement.

[88] Motion at 23, ¶ 59. Undisputed by PHOA. Opposition at 21, ¶ 59. *See also* Opposition at 27, ¶ 99. Undisputed by Travelers. Reply at 43, ¶ 99.

[89] Motion at 23, ¶ 60. Undisputed by PHOA. Opposition at 22, ¶ 60.

[90] Motion at 23, ¶ 61. Undisputed by PHOA. Opposition at 22, ¶ 61.

[91] Motion at 23, ¶ 62. Undisputed by PHOA. Opposition at 22, ¶ 62.

[92] Opposition at 24, ¶ 73. Undisputed by Travelers. Reply at 36, ¶ 73.

## DISPUTED FACTS

1.      After all of these inspections and additional discussion following the February 20 to March 2, 2012 inspections, in April 2012, HWC/PHOA came to an agreement with Travelers concerning the scope of work required to repair damage caused by the windstorm.[93]

2.      The agreed replacement cost to effect the repairs caused by the Windstorm was $1,357,535.92.[94]

3.      As reflected by the PHOA-HWC work orders, PHOA and HWC always planned to replace every roof at PHOA, without telling Travelers, and then seek to have Travelers pay for the replacements, despite the mutually agreed upon scope of repairs.[95]

4.      Mr. Lewis explained that Travelers had come to an agreement with PHOA regarding the scope of necessary repairs, which was reflected in the estimate prepared by HWC and attached to Mr. Lewis' May 14, 2012 email.[96]

5.      Despite their explicit agreement with Travelers on the scope and cost of repairs, and in furtherance of their scheme to force Travelers to pay for the additional work, PHOA and HWC commenced to replace every roof at PHOA without notice to Travelers even though "everybody" at PHOA and HWC knew of Travelers' standing request that PHOA advise Travelers of any need to deviate from the Agreed Scope.[97]

---

[93] Motion at 15, ¶ 27. Disputed by PHOA. Opposition at 12, ¶ 27. Travelers argues that PHOA never indicated to Travelers that there was any issue with the "agreement" that was made. Reply at 17-18, ¶ 27.

[94] Motion at 15, ¶ 28. Disputed by PHOA. Opposition at 12, ¶ 28. Travelers argues that PHOA never indicated to Travelers that there was any issue with the "agreement" that was made. Reply at 18, ¶ 28.

[95] Motion at 16, ¶ 31. Disputed by PHOA. Opposition at 13, ¶ 31 ("Deny that there was a mutually agreed upon scope of repairs."). Travelers argues any disagreement was never communicated to Travelers. Reply at 20, ¶ 31.

[96] Motion at 16, ¶ 33. Disputed by PHOA. Opposition at 13-14, ¶ 33 ("Deny. Admit that Mr. Lewis wrote an email dated May 14, 2012, attaching a repair estimate from HWC. Further, the email states that "[w]e believe the necessary repairs, to restore the property to its pre-loss condition as owed by the policy of insurance, can be completed for $1,357,535.92.")

[97] Motion at 18, ¶ 38. Disputed by PHOA. Opposition at 16, ¶ 38.

6.      The WA Report does not explain why every roof at PHOA had to be replaced, likely because every roof had been completely re-roofed by the time WA even began its inspections.[98]

7.      Nor does the WA Report state that the additional underlayment on low slope roofs is required by manufacturer specifications and code.[99]

8.      Likewise, the WA Report does not suggest that the sheathing's unnailable condition was caused by the windstorm.[100]

9.      Eric Hoff, one of the contributors to the WA Report, has since testified that the sheathing identified in the Supplement appeared to be damaged by years of water intrusion and not as a direct result of the Windstorm.[101]

10.     And, the WA Report does not explain how the sill flashing was required as a result of the Windstorm.[102]

11.     Travelers understood that HWC wrote an estimate and was of the belief that all the roofing and siding on the buildings needed to be replaced.[103]

12.     Travelers' consultant did not have any conversations with WA regarding the report.[104]

---

[98] Motion at 20, ¶ 46. Disputed by PHOA. Opposition at 18, ¶ 46 ("Plaintiff objects to paragraph 46, as such is not a factual assertion. The WA Report was not intended to explain why every roof at PHOA had to be replaced. The WA Report described the current condition of the exterior building components.").

[99] Motion at 20, ¶ 47. Disputed by PHOA. Opposition at 18, ¶ 47 ("Deny. The WA Report explains that the underlayment on low slope roofs is required by manufacturer specifications and code.").

[100] Motion at 20, ¶ 48. Disputed by PHOA. Opposition at 18, ¶ 48 ("Deny. The WAS Report explains that the damaged wood decking violated manufacturer specifications, and damaged sheathing discovered during demolition is to be replaced with the installation of new materials.").

[101] Motion at 20, ¶ 49. Disputed by PHOA. Opposition at 19, ¶ 49 ("Deny.").

[102] Motion at 20, ¶ 50. Disputed by PHOA. Opposition at 19, ¶ 50 ("Deny. The WA Report explains that the flashing is required by manufacturer specifications, among other reasons.").

[103] Opposition at 25, ¶ 79. Travelers denies that HWC/PHOA "explicitly maintained that position when the Agreed Scope was arrived at and distributed." Reply at 38, ¶ 79.

**DISCUSSION**

PHOA asserts two causes of action in its First Amended Complaint. The first cause of action relates to breach of contract, and the second relates to breach of the implied covenant of good faith and fair dealing.[105] Travelers moves for summary judgment on each cause of action.[106]

### A.  Travelers Is Not Entitled to Summary Judgment as to Breach of Contract Claims

"The elements of a prima facie case for breach of contract are (1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages."[107] Neither party disputes the existence of a valid contract—the Policy—but there are disputes about the remaining elements for breach of contract.

Travelers advances two arguments with respect to breach of contract. First, Travelers argues summary judgment should be granted in its favor "because PHOA breached the cooperation provisions of the Policy."[108] In essence, Travelers argues PHOA cannot state a claim for breach of contract because it has failed the second element by not properly performing under the Policy. Specifically, Travelers argues PHOA failed to abide by the cooperation provisions of the Policy.

Travelers also argues that summary judgment should be granted in its favor because it has fulfilled all of its obligations under the Policy. Travelers believes it has "paid for the repairs

---

[104] Opposition at 27, ¶ 97. Disputed by Travelers. Reply at 43, ¶ 97 ("Travelers objects to PHOA's" additional statement of fact because it is not supported by the cited testimony from Mr. Lewis).

[105] First Amended Complaint at 3, 4, attached as exhibit to Notice of Removal, docket no. 3, filed May 8, 2014.

[106] Motion at 2-3 ("Because Travelers has paid what was actually owed for covered damage caused by the windstorm and relied on an outside expert to guide its decision, it is entitled to summary judgment on Plaintiff's claims for breach of contract and bad faith.").

[107] *Bair v. Axiom Design, L.L.C.*, 2001 UT 20, ¶ 14, 20 P.3d 388, 392.

[108] Motion at 26 (some capitalization omitted).

caused by the Windstorm,"[109] and therefore, it has not breached the contract. Each of these arguments will be addressed in turn.

> ### i.    There Is a Genuine Issue Regarding Whether PHOA Failed to Perform

Travelers argues that the "undisputed evidence" shows that "PHOA failed to cooperate with Travelers in 'the investigation and settlement of the claim.'"[110] For support, Travelers points to the fact that the parties had an "Agreed Scope" about the extent of the work to be performed, yet PHOA "conspire[ed]" to do additional work without telling Travelers until the work had already been completed.[111] Travelers argues that "[t]his breach is itself sufficient to excuse Travelers from paying the Supplement, even if one were to assume Travelers was otherwise required to do so under the facts of the claim and the Policy."[112]

Travelers cites *Cardella*[113] for support, but *Cardella* does not support Travelers' argument. *Cardella* is not an insurance case; it is a case about consulting agreements and does not purport to make any findings or conclusions with respect to insurance policies.[114] Even more importantly, however, *Cardella* states that only "*uncured* material failure" in performance of a contract excuses the non-failing party from its duty to continue to perform.[115] There is a genuine dispute about whether PHOA committed an "*uncured* material failure" with respect to cooperation because PHOA's submission of the Supplement could be considered by a rational

---

[109] *Id.* at 27 (some capitalization omitted).

[110] *Id.* at 26 (citing Policy, ¶ E(3)(a)(6) and (9), pp. TRAV000082-83).

[111] Motion at 26.

[112] *Id.* at 26-27.

[113] *Cardella v. Mountain Reservations, Inc.*, No. 2:07-cv-01003-BCW, 2009 WL 971925, at *15 (D. Utah Apr. 7, 2009) (unpublished).

[114] *Id.* at *1.

[115] *Id.* at *15 (quoting *Aquagen Int'l Inc. v. Calrae Trust*, 972 P.2d 411, 414 (Utah 1998)) (emphasis added).

trier of fact as curing a material failure PHOA may have made with regard to submission of a claim.

The undisputed facts show that PHOA, through HWC, advised Travelers before work began that repairs and replacements would total about $2 million. Travelers then sent an email on May 14, 2012 stating that the work would be completed for $1.3 million, and gave instructions to PHOA about how to submit supplemental claims. While the May 14 email purports to include certain requirements for the submission of supplemental claims, such as "within three days" and "before work is completed," there is no requirement *contained in the Policy* that supplements be submitted within a certain time frame.[116] Instead, the only requirement under the Policy with respect to cooperation was that PHOA "[c]ooperate . . . in the investigation and settlement of the claim."[117] A rational trier of fact could conclude that PHOA did not fail to cooperate under *the terms of the Policy* because, even if such notice and submission did not take place within three days or before work was completed, as instructed by the May 14 email, PHOA ultimately notified Travelers of the need to replace or repair all roofs, notified Travelers of the amount it believed those repairs and replacements would cost, and then submitted the WA Report in support of the Supplement when Travelers requested more information. Thus, PHOA could be viewed has having satisfied the cooperation provisions in the Policy by "[c]ooperate . . . in the investigation and settlement of the claim."[118]

Furthermore, to the extent Travelers argues there was an "Agreed Scope" of the work to be performed, this fact is disputed,[119] which precludes summary judgment on this point.

---

[116] Opposition at 26, ¶ 85. Undisputed by Travelers. Reply at 41, ¶ 85.

[117] Motion at 11, ¶ 8; Policy at ¶ E(3)(a)(6) and (9).

[118] Motion at 11, ¶ 8; Policy at ¶ E(3)(a)(6) and (9).

[119] Motion at 15, ¶ 27. Disputed by PHOA. Opposition at 12, ¶ 27. Travelers argues that PHOA never indicated to Travelers that there was any issue with the "agreement" that was made. Reply at 17-18, ¶ 27.

Travelers' request for summary judgment that PHOA breached the cooperation provisions of the Policy is DENIED.

> ### ii.    There Is a Genuine Issue Whether Travelers Fulfilled All Its Obligations under the Policy

Next, Travelers argues that summary judgment should be granted because Travelers fulfilled all its obligations under the Policy. Travelers asserts that the parties "came to an Agreed Scope in May 2012," which "identified the repairs as a result of the Windstorm," and then "Travelers paid the amount it and PHOA agreed was due for the covered damages resulting from the Windstorm."[120] Travelers is incorrect.

As explained above, whether there was an "Agreed Scope" is disputed.[121] Therefore summary judgment cannot be granted based on an alleged "Agreed Scope." But further, Travelers is incorrect to suggest that because it paid the amount identified in the May 14, 2012 email ($1,357,535.92), it has fulfilled all its obligations under the Policy. In the same May 14, 2012 email that identified the amount Travelers believed it was obligated to pay, Travelers explained to PHOA that supplemental claims were foreseeable and, to some extent, expected. They were certainly not prohibited. Therefore, Travelers' payment of $1,357,535.92 to PHOA is not undisputed fulfilment of all its obligations under the Policy since Travelers recognized that supplemental claims may be submitted.

Travelers is also incorrect in its argument that it is undisputed that "each and every item identified in the Supplement is excluded from coverage by the unambiguous terms of the

---

[120] Motion at 27.

[121] *Id.* at 15, ¶ 27. Disputed by PHOA. Opposition at 12, ¶ 27. Travelers argues that PHOA never indicated to Travelers that there was any issue with the "agreement" that was made. Reply at 17-18, ¶ 27.

Policy." This is disputed by PHOA.[122] While PHOA does not dispute that Mr. Tiernan came to the conclusions he did and included them in his report, PHOA disputes the factual conclusions that the Supplement did not represent necessary repairs.[123] Travelers may be correct that some of the repairs performed under the Supplement were not covered under the Policy, and were therefore properly rejected. But that is not an undisputed fact. PHOA asserts that the items submitted with the Supplement constitute necessary repairs that should have been covered under the Policy. Because there is a dispute about whether the Supplement includes losses that are covered under the Policy, summary judgment is precluded on this point. In fact, Travelers admits, for purposes of this Motion, that the Supplement "accurately reflects the work that was performed and was reasonable and necessary to repair and/or replace the property damage loss."[124]

Finally, Travelers' argument that "nothing in the Supplement was required by code"[125] does not mandate summary judgment. Travelers may be correct that the repairs identified in the Supplement were not required by code. It is undisputed that PHOA has abandoned its position that the 2006 IRC applied, and admits the 2009 IBC was applicable to the PHOA repairs.[126] But code provisions do not establish that Travelers had no obligation to pay any part of the Supplement. PHOA points to Travelers' consultant, Pie, who "agreed to the replacement of roofs

---

[122] *See, e.g.,* Motion at 22, ¶ 58. PHOA *disagrees* with Mr. Tiernan, but does not dispute that Mr. Tiernan made this statement. Opposition at 21, ¶ 58. Opposition at 33 (citing Joe Hoffman Expert Report, Exhibit 16 to Motion, docket no. 30-17, filed October 13, 2015).

[123] Opposition at 21, ¶ 58. PHOA *disagrees* with Mr. Tiernan, but does not dispute that Mr. Tiernan made this statement. Opposition at 33 (citing Joe Hoffman Expert Report at 1, Exhibit 16 to Motion, docket no. 30-17, filed October 13, 2015).

[124] Reply at 42, ¶ 94.

[125] Motion at 33 (some capitalization omitted)

[126] *Id.* at 14, ¶ 26. Undisputed by PHOA. Opposition at 12, ¶ 26.

in their entirety due to the deterioration of the shingles."[127] PHOA also points to Mr. Hoffman's testimony to show that certain code provisions, such as underlayment for "low slope roofs," require the repairs outlined in the Supplement.[128] Further, PHOA cites to Mr. Hoffman's testimony to show that it is not only code that required the work outlined in the Supplement; it is also "manufacturer specifications."[129] Accordingly, Travelers' motion for summary judgment on PHOA's breach of contract claim is DENIED.[130]

## B. Travelers Is Entitled to Summary Judgment on PHOA's Breach of Covenant of Good Faith and Fair Dealing Claims

The Utah Supreme Court has held that the implied covenant of good faith and fair dealing "contemplates, at the very least, that the insurer will diligently investigate the facts to enable it to determine whether a claim is valid, will fairly evaluate the claim, and will thereafter act promptly and reasonably in rejecting or settling the claim."[131] The implied covenant "cannot be construed, however, to establish new, independent rights or duties not agreed upon by the parties."[132] Accordingly, "where there is no breach of an express covenant in a contract, there can be no cause of action for breach of an implied covenant arising therefrom."[133] First-party "bad faith" claims sound in contract, not tort.[134]

---

[127] Opposition at 34.

[128] *Id.* at 35.

[129] *Id.*

[130] PHOA does not dispute that the Policy limits Travelers' liability for *code repairs* at $25,000 for "each described premises." Motion at 33-34 (citing Policy, A(6)(k)(6) ("The most we will pay for [additional repairs required by enforcement of law and ordinance] in any one occurrence is $25,000 at each described premises."). To the extent any repairs or replacement was *required by code*, Travelers' liability is capped at $25,000 for "each described premises."

[131] *Beck v. Farmers Ins. Exch.*, 701 P.2d 795, 800 (Utah 1985).

[132] *Brehany v. Nordstrom, Inc.*, 812 P.2d 49, 55 (Utah 1991).

[133] *Craner v. Northwestern Mut. Life Ins. Co.*, 12 F.Supp.2d 1234, 1242 (D.Utah 1998); *see also Wardley Corp. v. Meredith Corp.*, 93 F. App'x 183, 186 (10th Cir. 2004).

[134] *Beck*, 701 P.2d at 800.

It is not certain that Travelers has fulfilled all of its obligations under the Policy. Therefore, Travelers is incorrect that summary judgment should be awarded because it has not breached any express provisions of the Policy.[135] However, one of the defenses to a breach of the implied covenant claim in the insurance context is that the claim was "fairly debatable."[136] The "analysis of whether an insurance claim is fairly debatable is closely related to an analysis of whether an insurer fulfilled its duty . . . to evaluate the claim fairly."[137] "[W]hen an insured's claim is fairly debatable, the insurer is entitled to debate it and cannot be held to have breached the implied covenant if it chooses to do so."[138] Not all cases involving the "fairly debatable" defense can be resolved as a matter of law,[139] but "[w]hether an insured's claim is fairly debatable *under a given set of facts* is . . . a question of law."[140] Thus, where there is an undisputed set of facts, the "fairly debatable" defense can be decided as a matter of law.

If there is a "legitimate factual issue as to the validity of [the insured's contractual] claim," summary judgment may be granted on a bad faith claim because a genuine factual dispute about the validity of a claim makes that claim "fairly debatable."[141] An insurer cannot be held liable for a breach of the duty of good faith when there are legitimate grounds for denial.

If the insurer consults with an outside expert and relies on that expert to make its decision, that expert's involvement "generally provides a good faith basis for an insurer's

---

[135] *See* Reply at 52.

[136] *Billings v. Union Bankers Ins. Co.*, 918 P.2d 461, 465 (Utah 1996).

[137] *Jones v. Farmers Ins. Exch.*, 2012 UT 52 ¶ 12, 286 P.3d 301, 305 (Utah 2012).

[138] *Billings*, 701 P.2d at 465.

[139] Reply at 3; *Jones*, 286 P.3d at 304 ("It is not the law in Utah that, when the insurance company argues a claim was fairly debatable, the case must be resolved by the court as a matter of law."); *id.* at 305 ("We take this opportunity to clarify that a bad faith claim need not be resolved on summary judgment whenever an insurance company argues that the claim was fairly debatable.").

[140] *Jones*, 286 P.3d at 303 (emphasis added) ("Whether an insured's claim is fairly debatable under a given set of facts is also a question of law.").

[141] *Id.* at 305 (internal quotation marks and citation omitted, alterations in original).

defense of a bad faith claim."[142] "Denying benefits under an insurance policy in reliance on an expert's report, . . . even if the expert's opinion is provided in exchange for remuneration, is not a bad faith denial because the expert's report creates a legitimate factual question regarding the validity of an insured's claim for benefits, making the insured's claim at least fairly debatable."[143]

Under the given set of undisputed facts above, PHOA's claim is "fairly debatable." That is, Travelers was "entitled to debate it and cannot be held to have breached the implied covenant [because Travelers chose] to do so."[144] It is undisputed that the Windstorm occurred and caused damage to PHOA's premises. It is also undisputed that PHOA was insured by Travelers under the Policy. It is undisputed that HWC provided an estimate, on behalf of PHOA, for the work it believed was necessary to perform, and that the estimate totaled approximately $2 million. It is undisputed that Travelers sent an email in May 2014 stating that the necessary work could be completed for $1.3 million. But the parties dispute whether an agreement was reached as to the $1.3 million Travelers asserted was proper for repairs. This is a "legitimate factual issue as to the validity of [PHOA's] claim,"[145] and there is a question as to whether the items identified in the Supplement should have been covered by Travelers. Travelers could be correct, or Travelers could be incorrect. But Travelers should not be held liable for a breach of good faith when there are legitimate grounds for denial.

Moreover, Travelers consulted with an outside expert and relied on that expert to make its decision, which "generally provides a good faith basis for an insurer's defense of a bad faith

---

[142] *Callioux v. Progressive Ins. Co.*, 745 P.2d 838, 842 (Utah App. 1987).

[143] *Prince v. Bear River Mut. Ins. Co.*, 2002 UT 68 ¶ 35, 56 P.3d 524, 535 (Utah 2002).

[144] *Billings*, 918 P.2d at 465.

[145] *Jones*, 286 P.3d at 305 (internal quotation marks and citation omitted, alterations in original).

claim."[146] Rather than denying the Supplement outright upon receipt, Travelers requested that its construction consultant, Mr. Tiernan of Young and Associates review the Supplement and the WA Report to determine "if the additional charges represent reasonable and necessary costs of repairs related to the [W]indstorm."[147] "Denying benefits under an insurance policy in reliance on an expert's report, . . . even if the expert's opinion is provided in exchange for remuneration, is not a bad faith denial because the expert's report creates a legitimate factual question regarding the validity of an insured's claim for benefits, making the insured's claim at least fairly debatable."[148]

Accordingly, under the set of undisputed facts outlined above, Travelers did not breach the implied covenant of good faith and fair dealing when it denied the Supplement. That decision may ultimately be determined to be incorrect, or it could be upheld. But it is clear that Travelers is protected under the "fairly debatable" defense in this instance.

---

[146] *Callioux*, 745 P.2d at 842.

[147] Motion at 21, ¶ 51. Undisputed by PHOA. Opposition at 19, ¶ 51.

[148] *Prince*, 56 P.3d at 535.

**ORDER**

IT IS HEREBY ORDERED that Travelers Motion[149] is GRANTED IN PART AND

DENIED IN PART. Travelers is not entitled to summary judgment with respect to its breach of

contract arguments, but it is entitled to summary judgment with respect to its "fairly debatable"

defense and the lack of bad faith in denying PHOA's Supplement.


Dated January 25, 2016.

BY THE COURT:

_____

David Nuffer
United States District Judge

---

[149] Motion for Summary Judgment ("Motion"), docket no. 30, filed October 13, 2015.